UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| [UNDER SEAL], | Case No.: |
| Plaintiffs, | COMPLAINT |
| vs. | |
| [UNDER SEAL], | |
| Defendant. | |

FILED IN CAMERA AND UNDER SEAL

DO NOT ENTER IN PACER

Peter W. Chatfield
peter@phillipsandcohen.com
Colette G. Matzzie
cmatzzie@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., NW
Washington, DC. 20036
Telephone: (202) 833-4567
Fax: (202) 833-1815

Claire Sylvia
cms@pcsf.com
PHILLIPS & COHEN LLP
131 Steuart Street, Suite 501
San Francisco, CA  94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Attorneys for Qui Tam Plaintiffs
Dr. Monte Schwartz and Ryan Tinsley

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MICHIGAN, MARYLAND, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WISCONSIN, THE DISTRICT OF COLUMBIA AND DOE STATES 1-24, *EX REL.* MONTE SCHWARTZ AND RYAN TINSLEY,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLERGAN, INC.,<br><br>Defendant. | Case No.:<br><br>COMPLAINT FOR VIOLATION OF: THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 et seq.]; CALIFORNIA FALSE CLAIMS ACT [Cal. Gov't Code §12650 et seq.]; COLORADO FALSE MEDICAID CLAIMS ACT [Colo. Rev. Stat. § 25.5-4-303.5, *et seq.*]; CONNECTICUT FALSE CLAIMS ACT [Conn. Pub. Law 09-05)], DELAWARE FALSE CLAIMS AND REPORTING ACT [6 Del. C. § 1201 et seq.]; FLORIDA FALSE CLAIMS ACT [Fla. Stat. Ann. §68.081 et seq.]; GEORGIA MEDICAID CLAIMS ACT [Ga. Code Ann. §49-4-168 et seq.]; HAWAII FALSE CLAIMS ACT [Haw. Rev. Stat. § 661-21(a)]; ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT [740 Ill. Comp. Stat.§ 175]; INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION |

COMPLAINT

ACT IC § 5-11-5.5 et seq.]; LOUISIANA
MEDICAL ASSISTANCE PROGRAM
INTEGRITY LAW [La. Rev. Stat. §
46.437.1 et seq.]; MARYLAND FALSE
HEALTH CLAIMS ACT, MD. Code Ann.,
§ 2-601, *et seq.*; THE MASSACHUSETTS
FALSE CLAIMS LAW [Mass. Gen. Laws
ch. 12 §5 et seq.]; MICHIGAN MEDICAID
FALSE CLAIMS ACT [Mich. Comp. Laws
§400.603(a)(1)(2)]; MINNESOTA FALSE
CLAIMS ACT, Minn. Stat. § 15C.01, *et
seq.*; MONTANA FALSE CLAIMS ACT
[Mont. Code Ann. 17-8-401 *et seq.*];
NEVADA FALSE CLAIMS ACT [Nev.
Rev. Stat. Ann. §357.10. et seq.]; NEW
JERSEY FALSE CLAIMS ACT [N.J. Stat.
§ 2A:32C-1 *et seq.*]; NEW MEXICO
MEDICAID FALSE CLAIMS ACT [N.M.
Stat. Ann., §27-14-1 *et seq.*]; NEW YORK
FALSE CLAIMS ACT [N.Y. Stat Fin. §
187 *et seq.*]; NORTH CAROLINA FALSE
CLAIMS ACT [N.C. Gen. Stat. §1-605 *et
seq.*]; OKLAHOMA MEDICAID FALSE
CLAISM ACT [Okla. Stat. tit. 63 §5053 *et
seq.*]; RHODE ISLAND FALSE CLAIMS
ACT [R.I. Gen. Laws § 9-1.1-1 *et seq.*];
TENNESSEE MEDICAID FALSE
CLAIMS ACT [Tenn. Code Ann. § 71-5-
181 *et seq.*]; TEXAS MEDICAID FRAUD
PREVENTION LAW [Tex. Hum. Res.
Code Ann. § 36.001 *et seq.*]; VIRGINIA
FRAUD AGAINST TAXPAYERS ACT
[Va. Code Ann. § 8.01-216.1 *et seq.*];
WISCONSIN FALSE CLAIMS FOR
MEDICAL ASSISTANCE ACT [Wis. Stat.
§20.931]; and DISTRICT OF COLUMBIA
PROCUREMENT REFORM
AMENDMENT ACT [D.C. Code Ann. § 1-
1188.13 *et. seq.*]

<u>FILED IN CAMERA AND UNDER SEAL</u>
<u>JURY TRIAL DEMANDED</u>

Plaintiffs Dr. Monte Schwartz and Ryan Tinsley, (collectively, "Relators") through their attorneys, Phillips and Cohen LLP, on behalf of the United States of America (the "Government" or the "Federal Government"), the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Wisconsin, the District of Columbia and Doe States 1-24 (collectively "the States") allege, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.    INTRODUCTION

1.    Defendant Allergan Inc. manufactures, markets, and distributes a medical device called the LAP-BAND.  The LAP-BAND is intended to aid in weight loss for severely overweight adults who have been obese for at least five years and for whom non-surgical weight loss methods have not been successful.  Severe obesity can contribute to a number of other significant health problems, including diabetes and high blood pressure.  Federal health care programs cover this procedure.

2.    The LAP-BAND device, which is implanted through a surgical procedure, is placed around the upper part of the stomach, creating a small pouch that can hold only a small amount of food.  This system helps the patient eat less by limiting the amount the patient can eat at any one time and increasing the time it takes for food to be digested. The band can be adjusted to allow food to pass through to the lower part of the stomach more quickly or more slowing by inflating or deflating a hollow band with a saline solution.  The doctor inserts the saline solution through an access port placed under the skin in the chest wall that connects to the band through tubing.  The LAP-BAND procedure involves the initial surgery, as well as follow up visits to adjust the band and to ensure that it is working.

3.     The Relators -- a former sales representative for Allergan and a bariatric surgeon who implanted Allergan LAP-BANDS -- allege that the access port on the LAP-BAND has a design defect that results in the access port leaking the fluid that is injected to expand the LAP-BAND. As a result of this defect, the LAP-BAND does not work as intended in many patients because it is not being properly inflated to restrict the passage of food to the stomach.

4.     The defect in the access port can result in an additional surgery to remove or replace the LAP-BAND, and/or failure of the LAP-BAND to produce the intended results, and/or misdiagnosis of the reason a patient is failing to lose weight.

5.     Relators and others have reported this defect to Allergan. Based on such reports, Allergan has determined the cause of the leak and has devised a modification to the device to address it. However, in order to avoid a recall of its product, Allergan has not informed doctors, patients, or the Food and Drug Administration ("FDA") of the defect and that it has devised a modification to address the defect.

6.     Allergan also has offered financial inducements to doctors for the purpose of getting them to continue to prescribe and use the LAP-BAND despite this known defect in the access port. Allergan has also engaged in a course of conduct to conceal the defect from the public, physicians and the FDA including making payments to physicians not to report the defect and lying to the public and to physicians about the cause of leaking access ports.

7.     As a result of Allergan's actions, patients have suffered harm, and the Federal Government, the States, and private insurers have paid for procedures, devices

and services that they would not have paid for had they been told the truth about the LAP-BAND.

8.     The FCA was originally enacted during the Civil War, and was substantially amended in 1986, in 2009, and 2010.   Congress enacted each of these amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive.   The amendments were intended to create and preserve incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

9.     The FCA provides that any person who presents or causes to be presented false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the United States to pay or approve false and fraudulent claims, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal government.

10.     The FCA allows any person having information about false or fraudulent claims to bring an action on behalf of the government, and to share in any recovery.   The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to enable the United States to conduct its own investigation without the defendant's knowledge and determine whether to join the action.

11.     As set forth below, defendant's actions alleged in this Complaint also constitute violations of the similar provision designed to protect State and/or state local government funds, and private insurance funds through California False Claims Act, Cal. Gov't Code § 12650, et seq.; the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871, et seq.; the Colorado False Claims Act, the Connecticut False Claims Act, Conn. Publ. Law 09-05; the Delaware False Claims and False Reporting Act, 6 Del. C. § 1201, et seq.; the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 1-1188.13, et seq.; the Florida False Claims Act, Fla. Stat. Ann. § 68.081, et seq.; the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, et seq.; the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21, et seq.; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1-8; the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. § 92; the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5, et seq.; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 437 et seq.; the Maryland False Health Claims Act, MD. Code Ann., § 2-601, et seq.; the Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 § 5 et seq.; the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 et seq.; the Minnesota False Claims Act, Minn. Stat. § 15C.01, et seq.; the Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 et seq.; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61 et seq.; the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 et seq.; the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 27-14-1 et seq. and N.M. Stat. Ann. § 44-9-1 et seq.; the New York False Claims Act, N.Y. State Fin. § 187 et seq.;

the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 et seq.; the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 et seq.; the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 et seq.; the Tennessee False Claims Act and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 4-18-101 et seq. and 71-5-181 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001 et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stat § 20.931 et seq. "Doe States 1-24," as referred to in this action, are States that currently do not provide for qui tam actions similar to those provided by the states listed above, but which may provide for such actions while defendants' misconduct continues and during the pendency of this action.

12.      Based on these provisions, *qui tam* plaintiffs and relators Monte Schwartz, M.D. and Ryan Tinsley, seek to recover all available damages, civil penalties, and other relief for federal and state violations alleged herein, in every jurisdiction to which defendant's misconduct has extended.

## II.      PARTIES

13.      *Qui tam* plaintiff Monte Schwartz, M.D. ("Dr. Schwartz" or "Relator Schwartz") is a resident of Tuscon, Arizona. Dr. Schwartz is the Bariatric medical director at Tucson Medical Center. He graduated from St. John's University, Saba University and the Mayo Graduate School of Medicine. Dr. Schwartz specializes in performing adjustable gastric band surgery for weight loss. He has performed more than 1,000 gastric band surgeries in Southern Arizona. Dr. Schwartz is a member of the American Society for Metabolic and Bariatric Surgery, and is a certified surgeon for the

Lap-Band system and Realize band system, as well as a proctor and clinical instructor for the procedure.

14.     *Qui tam* plaintiff Ryan Tinsley ("Mr. Tinsley" or "Relator Tinsley") is a resident of Gilbert, Arizona. He was hired by Allergan in June 2007 as an Account Manager with Arizona as his territory. In August 2010, Relator Tinsley was fired by Allergan for reporting the allegations in this complaint within Allergan. During his employment with Allergan, Relator Tinsley ranked #1 out of 45 account managers resulting in a President's Club award and winning Account Manager of the year in 2008. Prior to his employment with Allergan, Relator Tinsley worked as an Account Manager for Rita Medical Systems in Manchester, Georgia from 2005-2007, a Sales Representative for Johnson & Johnson from 2003 to 2005, and a Sales Representative for NetSource Technology from 2000 to 2003.

15.     Defendant Allergan, Inc. is a Delaware Corporation headquartered in Irvine, California. Through and together with its various operating divisions, Allergan, Inc. (collectively referred to hereafter as "Allergan") manufactures and sells drugs and medical devices throughout the United States and worldwide. At all times relevant to this complaint, Allergan manufactured, marketed and distributed the LAP-BAND, a gastric banding device designed to treat morbid obesity.

16.     Allergan sells pharmaceutical and device products in several divisions. Allergan Health is the division with responsibility for sales and marketing of the LAP-BAND.

17.     Robert Grant was President of Allergan Health.  Jim Caggiano is the Vice President and Sales and Marketing for Allergan Health.  Mark Didio is the Vice President of Sales for Allergan Health.

18.     In September 2010, Allergan entered into a settlement agreement with the Department of Justice and the Department of Health and Human Services under which it agreed to pay $600 million to the United States combined for civil damages and a criminal file for illegal, off-label marketing of Botox and kickbacks offered by physicians as part of the illegal marketing scheme for Botox.  As part of the September 2010 settlement, Allergan agreed to implement a three year Corporate Integrity Agreement in conjunction with the Office of Inspector General for the Department of Health and Human Services.

## III.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

20.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the Relators' state law claims, as those claims and the Relator's federal law claims are sufficiently related to form part of the same case or controversy under Article III of the United States Constitution.  This Court has express supplemental jurisdiction over the States' claims pursuant to 31 U.S.C. § 3732(b), as the States' claims arise from the same transactions and occurrences as the federal action.

21.     This Court has personal jurisdiction over Allergan, pursuant to 31 U.S.C. § 3732(a), as Allergan can be found in, resides in, transacts business in, and has committed acts related to the allegations in this Complaint in the District of Maryland.

22.     There has been no statutorily-relevant public disclosure of the allegations or transactions in this action that affect this Court's jurisdiction over Relators' claims. Even if there had been such a public disclosure, the Court would still have jurisdiction over the Relators' claims because the Relators  qualify under the FCA as "orginal source[s]" of the allegations they are making in this *qui tam* case, because they voluntarily provided to the Government the information upon which allegations in this case are based prior to the occurrence of any such public disclosure and prior to filing this action and/or because they have knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transaction that may be relevant to their claims. Relators, moreover, also satisfy the "original source" requirements that existed prior to enactment of the 2010 amendments to the FCA, because Relators' above-described knowledge is "direct" within the meaning of that superceded definition.

23.     Venue is proper, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c), as Allergan can be found in, resides in, and/or transacts business in the District of Maryland, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within this judicial district.

## IV.     APPLICABLE LAW

A.     The Regulation of Medical Devices

24.     The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, et seq. governs the manufacture and distribution of medical devices for human use.   The

FDCA defines a medical device to be, in part, "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease in man or other animals. . . ." FDCA § 201(h); 21 U.S.C. § 321(h).

25.    Medical devices are divided into three classes, I-III, based upon the level of risk posed to the public. Class I devices involve the least risk, while Class III devices involve the most risk.   Unless an exemption applies, the FDA does not allow manufacturers to market a medical device without submitting an application or submission to the FDA in advance. The class of the particular device determines the nature of the necessary premarket application or submission. Generally, any medical device introduce into interstate commerce for commercial distribution after 1976 is classified as a Class III device unless the FDA promulgates a regulation putting it in a different class or the device is "substantially equivalent" to another pre-existing device on the market. 21 U.S.C. § 360c(f)(1).

26.    Class III devices must receive FDA approval before they can be marketed to the public. The device maker must submit a premarket approval application ("PMA") to the FDA. The PMA must contain a number of elements, such as a summary of the overall application, a complete description of the proposed device, the technical results of non-clinical and clinical studies, and a device sample.

27.    The PMA must include detailed information about any clinical studies performed on the device. Broadly stated, the FDA wants to know all the material information about each study, including:

[R]esults of the clinical investigations involving human subjects with the device including clinical protocols, number of investigators and subjects per investigator, subject selection and exclusion criteria, study population, study period, safety and effectiveness data, adverse reactions and complications, patient discontinuation, patient complaints, device failures and replacements, tabulations of data from all individual subject report forms and copies of such forms for each subject who died during a clinical investigation or who did not complete the investigation, results of statistical analyses of the clinical investigations, device failures and replacements, contraindications and precautions for use of the device, and any other appropriate information from the clinical investigations.

21 C.F.R. § 814.20(b)(6)(ii).  In addition to information on clinical investigations, the

FDA also requires a bibliography of all published reports "whether adverse or supportive,

known to or that should reasonably be known to the applicant and that concern the safety

and effectiveness of the device." § 814.20(b)(8)(i).

28.    When a device manufacturer wants to make a change that affects the

safety or effectiveness of a medical device for which the manufacturer has an approved

PMA, it must submit a PMA supplement.    See 21 C.F.R. § 814.39.    The PMA

supplement generally must contain the same types of information as a PMA.  § 814.39(c).

29.    In addition to pre-market approval, the FDCA requires that manufacturers

of medical devices submit certain reports, notifications, and applications to FDA.  21

U.S.C. § 360i.  Among other things, a manufacturer of a medical device must promptly

report any correction of a medical device if the correction was undertaken to reduce a risk

to health posed by the device.  21 U.S.C. § 360i(g).  The failure or refusal to do so is a

violation of the Act.  The FDCA also prohibits the filing of any false or misleading

report.  21 U.S.C. § 360(q)(2).

30.    The FDCA also prohibits the introduction into interstate commerce of any misbranded medical devices. 21 U.S.C. § 331(a), (k). A medical device is misbranded if its labeling is false or misleading. 21 U.S.C. § 352(a). Likewise, misbranded devices may not be sold after interstate shipment of the device, or a device component. 21 U.S.C. § 331(k); 21 U.S.C. § 333 (imposing penalties).

31.    A medical device is misbranded if it is hazardous to patient health when used as directed in its labeling. 21 U.S.C. § 352(j). The FDCA also prohibits the advertising of medical devices that is false or misleading in any way. 21 U.S.C. §§ 352(q)(1), ( r).

32.    With the exception of certain investigational devices not at issue in this case, medical devices must be approved by the FDA in order to qualify for Medicare coverage. Medicare Benefit Policy Manual, Ch. 14, § 10. Medicare does not cover services related to a non-covered medical device. Id. at § 80.

B.    Government Health Care Programs Reimburse Only Medically Necessary Treatments and Services

33.    To participate in the Medicare and Medicaid programs, providers are obligated to submit claims for reimbursement only for "reasonable and necessary medical services." 42 U.S.C. § 1395y(a)(1)(A). When performing a procedure reimbursable by Medicare or Medicaid, providers must assure that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a). Furthermore, in performing a reimbursable procedure, a provider must assure that the service will be supported by evidence showing that it was medically necessary. 42 U.S.C. § 1320c-5(a)(3).

34.    When presenting a claim for reimbursement to Medicare or Medicaid, the provider must certify that the service provided was medically necessary.  42 U.S.C. § 1395n(a)(2)(8).

35.    Medicare began coverage for the LAP-BAND system in 2006.  The Federal Employee Health Benefit Plan and Tricare began coverage for the LAP-BAND system in 2007, retroactive to Feb 2007.  Medicaid also covers the LAP-BAND system in some states.

36.    The CPT codes used for LAP-BAND system insurance coverage include 43770-43774, 43886-43888.  Initial placement of such devices is billed under CPT code 43770.  Adjustments made to the device during through the typical post-operative period of follow-up care are considered part of the surgical procedure and therefore not separately billable.  Adustments that must be made after the post-operative period for the typical patient are billed under CPT code 43771.  Revisions through a surgical opening of subcutaneous ports associated with such device are billed under CPT code 43886. Removal of such ports is billed under CPT Code 43887. Removal and replacement of such ports is billed under CPT code 43888.

37.    Tricare pays the physician approximately $750 for each band implant and reimburses the hospital between $6500 and $12000 for each implant and pays $1000 for anesthesia for each implant.  Adjustments must be performed at designated Centers of Excellence for Medicare to pay.

C.    The Anti-Kickback Act

38.    The federal health care Anti-Kickback Act ("AKA"), 42 U.S.C. § 1320a-7b(b) addresses concerns that financial inducements can influence health care decisions

and result in the provision of medically unnecessary, poor quality, or even harmful care. The AKA prohibits the payment of kickbacks in any form, regardless of whether the particular kickback actually results in overutilization or poor quality of care.

39.     The Anti-Kickback Act prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b).  Companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order or recommend devices that may be paid for by Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, or other federal heath care program.

40.     The law prohibits not only outright bribes and rebate schemes, but also forbids any payment to a physician that has as one of its purposes inducement of the physician to increase utilization of goods or services reimbursed by federal health care programs.

41.     Compliance with the Anti-Kickback Act is a precondition to participation as a health care provide under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, or other federal heath care programs.  With regard to Medicaid, for example, each physician that participates in the program must sign a provider agreement with hi or her state.  Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, which include the anti-kickback provisions of the law.  In some states, the Medicaid claim form

itself contains a certification by the provider that the provider has complied with all aspects of the Medicaid program including compliance with Federal laws.

## V.    SUMMARY OF FACTS

A.    FDA's Approval of the LAP-BAND Gastric Banding System

42.    On June 5, 2001, FDA approved the LAP-BAND Adjustable Gastric Banding System – P00008 on an application submitted by then- manufacturer Bioenterics Corporation of Carpinteria, CA.

43.    The LAP-BAND System is a long-term implantable device intended to induce weight loss in morbidly obese patients by limiting food consumption (restrictive rather than malabsorption).   The device is surgically implanted, using either a laparoscopic or open procedure, to create a restricted opening (stoma) and a small gastric pouch to limit food consumption and induce early satiety.   The main components of the device are the silicone elastomer band, the access port and kink-resistant tubing used to connect the other two components.   The inner surface of the silicone band, which is placed around the stomach, is inflatable and connected by the tubing to the access port (a remote injection site).

44.    The access port is designed to allow for post-operative non-surgical adjustment in the stoma diameter.   Physicians make periodic adjustments depending on the patient's weight loss, food cravings and physical reaction. Adjustments are typically performed 4-6 times per year by injecting saline into the access port causing the inner surface of the band to inflate and thus decreasing the size of the stoma.   Saline can be removed from the LAP-BAND causing the band to deflate and increasing the size of the stoma.

45.     Under the FDA approval letter, three kinds of needles work with installation and use of the LAP-BAND: a 16 gauge hand priming needle used to flush and prime the band tubing and inflatable shell with sterile saline, a 22 gauge access port flushing needle used to flush and prime the access port with sterile saline, and a 20 gauge, non-coring, defelected-tip needle designed to penetrate the access port during postoperative adjustment of the band.

46.     The 2001 approval letter states that the LAP-BAND System® is indicated for use in weight reduction for severely obese patients with a Body Mass Index (BMI) of at least 40 or a BMI of at least 35 with one or more severe comorbid conditions, or those who are 100 lbs. or more over their estimated ideal weight according to the 1983 Metropolitan Life Insurance Tables (use the midpoint for medium frame).  It is indicated for use only in severely obese adult patients who have failed more conservative weight-reduction alternatives, such as supervised diet, exercise and behavior modification programs.

47.     The approval letter limits the sale, distribution or use of the device to prescription use in accordance with requirements set forth in the Federal Food, Drug and Cosmetic Act.  The approval further limits use of the device to practitioners trained to use the device as approved in the order.

48.     As a condition of marketing approval, FDA directed BioEnterics to follow subjects in an investigational study (Protocols A and B) for 5 years. "Outline for Lap Band System Post Market US Study."

49.     FDA also directed BioEnterics to provide the results of the post approval studies in any PMA supplement when the study is complete.

50.     In addition to the Postapproval Report, FDA required as an additional condition of approval the submission of Adverse Reaction and Defective Device Reports to the Center for Devices and Radiological Health, FDA, within 10 days after the manufacturer/distributor receives or has knowledge of information concerning, inter alia, adverse effects or defects in the device.  Both reports are required annually and should include the number of reported and otherwise known instances of each category during the reporting period.

51.     Adverse Reaction Reports should document any adverse reaction, side effect, toxicity, or sensitivity reaction to the device that is occurring with unexpected severity or frequency.

52.     Device Defect Reports are required to address any significant failure of the device to meet the specifications established in the PMA that are not correctable by adjustment or other maintenance procedures described in the approved labeling.

53.     Failure to comply with the conditions of approval set forth in the June 2001 letter invalidates the approval order.  Commercial distribution of a device not in compliance with these conditions is a violation of the FDCA.

54.     When unanticipated adverse effects or device failures necessitate a labeling, manufacturing or device modification, a PMA supplement must be submitted and the modified device must be subjected to testing designed to determine if the modified device remains safe and effective.

55.     FDA approved the LAP-BAND system based on a single clinical study conducted within the United States under a significant risk Investigational Device Exemption (IDE) to assess the safety and effectiveness of the LAP-BAND system in the treatment of severe obesity.  The study was a prospective, multi-center, single-arm trial in which each subject served as his or her own control.  Two hundred ninety-nine patients participated in the study.  The average weight loss seen in the U.S clinical study was approximately 36-38% of the excess weight of the patient 2-3 years after the surgery. Weight loss was described in terms of the percent of excess weight lost (EWL) by the person. The majority of patients enrolled in the clinical trial lost at least 25% of EWL.

56.     In the LAP-BAND System U.S. clinical trial, 266 of 299 (89%) subjects reported at least one adverse event.  Peri-operative adverse events were reported in 44% of the study subjects. The most commonly reported peri-operative adverse events were abdominal pain and nausea and/or vomiting.  Eighty-two percent (82%) of subjects reported having one or more adverse events during the post-operative period.  The most commonly reported adverse events in the post-operative period were nausea and/or vomiting, gastroesophageal reflux, and band slippage/pouch dilatation.

57.     In the Summary of Safety and Effectiveness Data accompanying FDA's 2001 approval letter, Bioenterics reported that port leakage accounted for three percent of the adverse events reported within the clinical trial.

58.     In the first fourteen months after approval of the silicone adjustable gastric banding system (2001-2002), FDA reviewed 556 adverse events reports related to the use of the band.  Serious injuries reported for the device included eight cases of band erosion into the stomach, one with migration into the small bowel; eight cases of heartburn,

reflux, regurgitation and/ or vomiting; one case of "strangulation" of the stomach and subsequent bleeding; and one case due to gastric outlet obstruction secondary to band slippage. Eighty nine percent of adverse events received were leaks at or near the port.

B.      Allergan's Marketing of the LAP-BAND Gastric Banding System

59.     In 2006, Allergan acquired the LAP-BAND gastric banding system. Allergan launched an aggressive marketing campaign for the LAP-BAND system including marketing through Direct-To-Consumer advertising and offering various financial inducements to physicians including lucrative consulting arrangements, investigator trials, marketing support and free reimbursement support.

60.     The following individuals occupied positions of authority within Allergan during the relevant time period and are referred to by name throughout the allegations in this pleading: Robert Grant (former President Allergan Medical), David Endicott (current President, Allergan Medical), Jim Caggiano (Vice President, Sales and Marketing, Allergan Medical), Vern Vincent (Senior Director, Global Professional Education-Health), Randy Price (Senior Marketing Director), Mark Didio (Vice President, Sales), Matt Cavanaugh (former Regional Director, Western Region), and Kim Colautti (current Regional Director, Western Region).

61.     Allergan has also involved its key investigator physicians in clinical trials designed to expand LAP-BAND applications to younger and less overweight patients. Allergan is sponsoring clinical trials in teens between the ages of 14 and 17 as well as adults who are not as heavy as most bariatric surgery candidates. To make the band adjustments easier, the company is developing a remote-control system that would allow surgeons to loosen or tighten the devices telemetrically.

{00024033; 1}

62.     Allergan used access to clinical trial participation as an inducement for physicians to recomment for their patients exclusively, or near exclusively, Allergan's LAP-BANDS and negotiated arrangements with hospitals for free LAP-BANDS and additional discounts for exclusive or near-exclusive use of Allergan bands.

63.     In 2007, FDA approved a device – the Ethicon Band – manufactured and sold by Johnson and Johnson (J&J).   The Ethicon Band is the first, and only, direct competitor to the LAP-BAND gastric band system.   J&J used aggressive marketing tactics to attempt to pull market share away from Allergan including weekend training sessions of surgeons on its banding system and the introduction of a website tailored to patients using the J&J band on which to track the patient's personal weight loss experience and allowing physicians the opportunity to track the patient's success (**www.realizemysuccess.net**).

64.     Allergan responded with direct patient support and substantial amounts of direct to consumer advertising.   Allergan also entered into a contract for co-marketing with Covidien in 2008.

65.     Allergan also heavily marketed LAP-BAND as a revenue source for surgeons by detailing surgeons on how to leverage the procedures for adjusting the gastric band.   In September 2009, at a National Sales Meeting, Ian Eastman from North Carolina walked sales representatives through an "algorithm" to sell physicians on how to turn adjustments on the gastric lap band systems into a financially lucrative annuity.

66.     Allergan also provides additional inducements for surgeons by providing staff training on how to perform adjustments on LAP-BAND patients to make adjustments a profitable revenue stream for the physician's business.   One of the most

{00024033: 1}

prominent persons who provides this "professional education" on coding for adjustments and making the gastric lap band system more lucrative is Gaspar Rosario, a Physician's Assistant for two prominent bariatric surgeons, Dr. George Fielding and Dr. Christine Ren at NYU Program for Surgical Weight Loss.  Mr. Rosario is paid by Allergan for these presentations.

C.     Allergan's Knowledge of Design Defect with Access Port

67.     Starting in the Summer of 2008, Allergan senior managers were made aware of numerous incidents of port failure and explants due to port leaks by key bariatric surgeons and sales representatives across the country.

68.     Rather than addressing the leaking port defects by reporting the defective device to FDA or proposing to remedy the defect, Allergan senior officials sought to deflect concerns of surgeons and patients and to conceal Allergan's knowledge of a significant rate of failure in the ports from leakage.

69.     Starting in 2008, Relators became aware of a failure rate caused by leaking ports materially in excess of the 3% reported in the original clinical trial accompanying the 2001 FDA approval.

70.     On August 1, 2008, Relator Tinsley first reported to his Regional Director, Matthew Cavanaugh, that Relator Dr. Schwartz is having "port issues." Cavanaugh replied that he is "rattling some cages."

71.     Relator Tinsley filed a "No Charge Product Request" with Allergan for Dr. Schwartz noting that "Dr. Schwartz has had a run of bad ports lately.  This incident was the second in two days last week.  He removed this port and replaced it then injected it with Methaline Blue.  At this point the port was leaking from the point where the

septum touches the plastic on top of the port. An incident report has been filed and the port is being sent back to Allergan for evaluation."

72.     On August 1, 2008, Account Manager Craig Britten, a sales representative in the Northwestern United States, also sent Cavanaugh an email reporting that he had been hearing from two of his biggest Lap Band customers -- Pacific Surgical Weight Loss Center (Dr. Neal) and Northwest Weight Loss Surgery (NWWLS) – about several leaky ports. Britten noted that he had sent 4 ports back for Dr. Neal a few months ago and had tested them and noticed all of them leaking from the posterior. When these ports were sent to product support, Allergan only reported back that only one port was defective. Dr. Neal had an additional 14 ports that he had removed and was waiting to send back. Britten noted that, because the physician guarantees the procedure, "he is personally on the hook for each port and replacement surgery" and "this is a ton of extra money he has to pay to fix a faulty product."

73.     The same August 1, 2008 email from Britten notes that NWWLS has 15 ports that they sent back in February 2008 and they had not received a response from product support. They had recently removed three more ports. "They are frustrated with product support" and "in all of the years that they have been doing bands they have not received a replacement port based on the returned item being defective. They would like some help with this and are awaiting a response."

74.     The same August 1, 2008 email notes that most of the Port I leaks are in the septum and most of the Port II are on the back (posterior). Later observation of leaking ports confirms that observation.

75.     That same day, Vice President, Sales and Marketing James Caggiano and Vice President, US Sales James Locke were informed of the leaking ports in the Northwest region by Cavanaugh.  Cavanaugh also told Caggiano and Locke that Dr. Schwartz, was having the same problem with leaking ports and "product support can't seem to find it."  Cavanaugh noted that the removal of the ports and implantation of replacement port was costing Dr. Schwartz $2,500 each time.  Cavanaugh noted that Schwartz wanted someone from Allergan engineering to witness removal and leaking of the ports at his surgical center and that he wanted more ports to put in patients and to discuss the cost of replacement surgeries.

76.     Vice President James Caggiano responded to Cavanaugh regarding Dr. Schwartz's complaint about the ports: "I'm not sure I understand exactly what's going on here but it seems like the doc thinks, and we agree, that part of our equipment is faulty. If that is true we should get him free replacement parts immediately. What am I missing?"

77.     Regional Director Matt Cavanaugh responded to Dr. Schwartz, noting that he had elevated the "port issue" to Jim Caggiano:  "...I have also proposed the idea of having someone from Allergan product team come out and see the ports being explanted and check the system at the surgical field to check the fluid volume before explanting the ports. Maybe we could get you to document the fluid on your last adjustment and then see the change at the time of surgery. This would be very helpful.  I believe this could help identify any durability or manufacturing questions."

78.     Cavanaugh also offered Dr. Schwartz a series of options for extending his relationship with Allergan: "Allergan is very much committed to the success of your

practice in Tuscon and will make sure that we can help you reach all of your goals both clinically and financially."

79.     On September 16, 2008, Relator Tinsley reported to Regional Director Cavanaugh that Dr. Schwartz was having additional problems with port leakage: "Today he had two cases with the LAP band and when he went to attach the port there was a clear 'rattling' sound coming from inside the port. This happened two cases in a row... The most pressing issue still remains that he hasn't heard one word back from our company regarding the original ports he sent back to our company."

80.     By return email, Cavanaugh responded to Tinsley stating, "You need to manage these situations better. You can't play the 'I don't know card.'"... It is your responsibility to know the product you are selling and to know that the bee bees float inside the port....I can't build you up in the eyes of the customer and not have you be able to solve/answer some questions for them. How do you know that Dan hasn't sent a letter already?"

81.     The next day Relator Tinsley again raised the difficulties Dr. Schwartz was having with port leakage with Matt Cavanaugh: "Its been over two months....On August 1st you copied me and Craig on an email saying we are starting to gain some traction with product support and you'd keep me posted. We haven't heard a word back from anyone and obviously Dr. Schwartz hasn't either."

D.     Allergan Product Support's Response to Leaking Ports

82.     On September 23, 2008, Allergan Product Support sent two letters to Dr. Schwartz regarding two leaking ports. The first letter for SERIAL No 13126596 notes that "a leak test inspection revealed leakage to the port base and pulled material from the

port septum." The second letter for Serial No. 13137364 states, "a leak test inspection revealed leakage to the port base." Both letters note that "a microscopic examination revealed a striated cut to band tubing most likely caused by surgery to remove the device."

83.     A few days later, Regional Manager Cavanaugh sent a document to Tinsley regarding port leaks and directed him to share it with Dr. Schwartz. Relator Tinsley inquired, "Does this mean the port is officially defective?" However, he did not receive a response to this question.

84.     A month later, on October 24, 2008, Relator Tinsley sent another product report request to Product Support stating, "Dr. Schwartz is continuing to have port issues. As of this week he has 4 more that he is changing out. His office sent back a number of faulty ports but has yet to hear back from Allergan on the results of the testing."

85.     "On November 19, 2008, Regional Director Cavanaugh wrote to Tinsley acknowledging that the company "appeared to have a problem with leaking ports." He wrote, "We have heard a lot about 'leaky' ports in the last few months from the base and all of these customers talk."

86.     On December 1, 2008, Dr. Schwartz' practice reported three additional returned product to Allergan for leaking ports.

87.     Despite the concerns raised by Dr. Schwartz and other physicians in 2008, Allergan did not take steps to remedy the leaking ports.

88.     Relators are aware that the following physicians have experienced leaking ports and raised concerns about the leaking ports with Allergan representatives: Drs. George and Chris Ren at NYU Medical Center; Drs. Michaelson and Montgomery at

Northwest Weight Loss in Washington State; Dr. Neal at Pacific Surgical; Dr. Waldrop in Sacramento; Dr. Kirschenbaum in Texas; Dr. Todd Eibes in Iowa; Dr. Simpson in Phoenix; and, Dr. Schwartz in Tucson, Arizona.

89.    Allergan also failed to submit Defective Product Reports to the FDA and concealed from FDA the extent of the port failures due to leakage.

E.    Allergan's Marketing Scheme to Conceal Defects in Leaking Ports

90.    Instead of recalling the defective ports, Allergan developed a marketing strategy to take advantage of the leaking ports problem. Allergan sought to shift focus away from the defective ports to the use of non-Allergan needles and the technique of bariatric surgeons. Allergan also decided to use the defect as a revenue opportunity to promote exclusive use of Allergan needles for port adjustments.   .

i.    The "Needle Campaign"

91.    To launch the "needle campaign," Randy Price, Senior, Director of Marketing wrote to the entire Allergan medical sales staff on February 21, 2009: "There is a high level of importance and real opportunity to actively promote Allergan non-coring Huber needles for port adjustment." He noted that "Allergan offers 2 needles sizes: 2-inch and 3.5-inch non-coring Huber needles" and that "We estimate that of all adjustments made in 2008, Allergan needles were used in only about 30% of cases – a real opportunity for growth."

92.    The February 2009 letter proceeded to blame "non-Huber needles or low/variable quality non-coring Huber needles" for damaging the access port and "lead[ing] to port leaks." Price wrote, "This results in suboptimal experiences and outcomes for patients and practices. Damaged ports require significant Allergan

resources to analyze and handle appropriately, and can result in challenging situations with our key surgeons."

93.    Allergan's campaign to cover up the leak problem was launched in this February 2009 email:  "Allergan Health AM's are requested to immediately being proactive messaging of the importance of using only Allergan needles for adjustments." The following message was recommended, "In order for patients to fully benefit from the LAP-BAND® System, the whole system must be handled as recommended.  The use of non-Huber or variable quality Huber needles is highly discouraged as it may result in damage to the septum that can lead to a port leak.  Allergan can only recommend the use of the Huber non-coring needles that satisfy the quality standards established and provided by Allergan."

94.    From that time on, Allergan attempted to steer concerns about port leakage into discussions about what type of needle was being used and how physicians were using the needle to access the port.  Senior managers at Allergan, including Caggiano, Vincent and Didio, had concluded that the product defect could be used as an opportunity for marketing non-coring needles marketed by Allergan.

95.    On February 27, 2009, Dr. Schwartz's office personnel again wrote to Relator Tinsley regarding a defective leaking port that Dr. Schwartz had returned to Allergan: "As we discussed, I thought I needed to get his port back to you ASAP per: Dr. Schwartz.  But I realized after talking with you that the original faulty port was returned in the past.  Dr. Schwartz wants to know if you can find out what the decision was on the original port."

96.     On March 4, 2009, Relator Tinsley wrote to Vice President, Sales, Mark Didio and Vern Vincent, stating urgently that he needed to discuss with them "Dr. Schwartz and the bad run of ports he had back in September." He explained that Dr. Schwartz is not happy because he feels that the September 2008 letter acknowledges that the ports are defective but that Allergan has not taken any steps to correct the defect. Allergan's product support had stopped sending kits to Dr. Schwartz to retrieve the defective ports. Relator Tinsley noted that Dr. Schwartz had lost a lot of potential revenue because of leaking ports and this may cause him to switch to J&J bands.

97.     On March 13, 2009, Vern Vincent, sent two emails within Allergan concerning the leaking ports. Vincent stated in the first that he would speak with Dr. Schwartz and that "we will address each return. If the ports were defective, we will replace them. If patients want to request payments, or whatever, then they are welcome to and each case will be considered individually."

98.     The second March 13, 2009 email from Vincent stated that Allergan had responded to Dr. Schwartz's concerns about leaking ports through the September 2008 letters. "Attached is a letter that was sent to Dr. Schwartz about one of his top 3 most angry port patients. The letter clearly says that 'pulled material' was seen on the top of the port. This is from using the WRONG needles. No payment was made for medical costs as the port did not have a manufacturing defect. I am going to lab early next week to look at all his returns. If they are all cored and have silicone pulled out the top, from using the wrong needles, then we will have to message this and manage the screaming. If this is not the case then we will address each case individually and directly with each patient."

99.   Relator Tinsley inquired, in response, "are we saying he was using the wrong needles even though they were Huber needles? We have only recently said that they should be using Lap-Band needles. If in fact there are distributors packing needles that claim to be Huber but aren't then that's something our customers need to know."

100.   Vincent replied that he had discussed the Allergan needles with Dr. Schwartz by phone and that "we are planning to get this word out. Several are working on how to message this without creating a backlash from several directions. I am under the impression that the entire field was already told the big picture: use our needles to be sure you are using the right needles."

101.   On March 17, 2009, Vern Vincent sent an additional email within Allergan stating: "Attached are pictures from 6 of the ports in our lab, returned by Dr. Schwartz in the last few months.... Someone, somewhere, stuck these ports with a needle other than a standard Huber."

102.   Vincent then denied there was any defect with Allergan's ports and stated "the use of our needles is a clear step for him to take to move away from defects like these. And we should consider making exceptions regarding replacement products and possible additional support due to the miscommunication and number of patients that are angry and getting louder and louder about their 'failures.'"

103.   Relator Tinsley responded to this email, explaining "what Dr. Schwartz was referring to was the part in the report that says 'A leak test inspection reveals leakage to the base.' .... I think that's the part of the letter where he feels it was confirmed as a manufacturing defect not so much the pulled material from the septum."

104.   Vice President Caggiano responded to this discussion by saying: "Vern: Let me know what you think live tomorrow. I want to make sure we treat him fairly as we keep in mind the company's interest."

ii.   Allergan Refuses Requests from Surgeons to Remedy Port Defect

105.   Two days later, on March 19, 2009, Dr. Schwartz again raised his concerns with Relator Tinsley and expressed his frustration with not hearing back from Allergan. Dr. Schwaryz noted: "I have three more patients with leaking ports that I have identified that I will need to remove. I spoke with [Dr.] Terry Simpson [Phoenix bariatric surgeon] and he has had two leaking ports despite only using Allergan needles and he has spoken with other surgeons with the same issue. Sounds like this may be a very big issue for Allergan. Hope they do the right thing for our patients and for Allergans loyal surgeons." Relator Tinsley forwarded this message to Vincent, Caggiano, Didio, and Cavanaugh.

106.   The same day, Vice President James Caggiano responded to these concerns by email. Caggiano wrote that it was his understanding from Vern Vincent that someone used the wrong needle on Dr. Schwartz's ports and "that caused the leaks in most – if not all cases." He noted further that the company has opened an inquiry for Schwartz's three patients within Allergan to determine what if any restitution should be made. Caggiano concluded, "The short of this is it is very likely that in almost all of the cases if not everyone using the wrong needle is the culprit. The surgeons don't want to hear that so we must handle it delicately. This has happened in other areas of the country – NYC and once the account saw the pix the issue was put to bed."

107.   Three days later, on Sunday March 22, Vice President. Sales, Mark Didio called Relator Tinsley and told him that he should watch his tongue and that "The fact of the matter is we do have a problem with the ports but once you admit that to a surgeon we could have a recall and that's bad for everybody." (emphasis added).

108.   On March 23, 2009, Regional Manager Matt Cavanaugh and Vice President James Caggiano met with Dr. Schwartz and several other Arizona surgeons and summarized the meeting within Allergan management.  Cavanaugh noted that all of the surgeons mentioned concerns with ports and that "they are very concerned we might have a recall.  They want to know what is going on." Cavanaugh continued:  "They are concerned we are covering up a big problem" and that "this is a reason to get trained on J&Js band if a recall might occur.  Dr. Simpson mentioned he was going to have 2 leaking ports sent for an 'independent examination.'"  Caggiano summarized the same meeting and noted that he was to discuss "port issues" with Schwartz' staff and find a way to "take these patients out of the doctor's hands and remove the hassle."

109.   On March 30, 2009, Britten, the Allergan account manager in the Northwest, informed Allergan executives of ongoing concerns about the Lap-band port in that region and passed along emails from Jessie Ahroni, NP, and Drs. Pat Paulson and Kevin Montgomery complaining about the new needles.  Britten stated, "I have 3 similar messages from various nurses at Northwest Weight Loss. I spoke at length with Dr. Michaelson yesterday and he went into further detail. He said the needles seem more dull, have bigger gauge, hurt more going in, bend more easily and do not release from the septum when you withdraw them which makes it more painful for the patient coming out. He is not accepting the idea that the needles alone are causing the port issues."

110.   On March 30, 2009, Vincent responded to Account Manager Britten, copying Caggiano and Cavanaugh, and stating he would speak with Drs. Montgomery and Michaelson: "I will hear them out, then share what we are learning about the needle issue, and go over the rapid entry needle stick technique that is necessary to quickly break the skin with a REAL Huber, like ours.  The comment about our needles being so dull actually confirms that the needle they were using may have been labeled a Huber, but they are way too sharp and are killing the ports."

111.   On March 31, 2009, Vincent reported back to Caggiano and Cavanaugh that he had spoken directly with Jessie Ahroni at Northwest Weight Loss.  "I basically asked her to champion getting her team to get that the excel needles are just too suspect to keep using....   She said that she would give everyone a pep talk and wants to know our test results."  Ahroni had also spoken with Dr. Terry Simpson in Phoenix and heard "he has a bunch of leakers, also using Excel needles."  Vincent reported that he had told Ahroni "we may need her help in re-teaching lots of folks about this.  If she feels more part of us and part of the fix, all the better."  He also noted that they have not seen the same problem with J&J's port and they would "hate to give up on the better band" because of the leaking ports.

112.   On March 30, 2009, Dr. Schwartz wrote both to VP Caggiano and Relator Tinsley asking, "What is the plan with the port issue? Have you contacted my patients yet?"  VP Caggiano responded, "Not yet, but the issue is at the highest levels.  Our quality department is conducting tests over the next few days to confirm our suspicions.  Then we will get the official word to our customers and handle the patients."

113.    On March 31, 2009, Dr. Schwartz reported to Tinsley that "I used the Allergan needles yesterday … doing about 50 adjustments. I have to say, the Allergan needles suck. They don't penetrate the skin well at all … and there is much less "feel" for the port with these needles."

114.    Same day, Relator Tinsley forwarded Dr. Schwartz concerns on to Matthew Cavanaugh and Mark Didio: "I'm getting what seems like daily updates from customers and all of them are around ports or needles and none of them good. Please keep me in the loop as far as what is going to happen next. Is this the first we heard of this issue with our needles?"

115.    On March 31, 2009, Vincent responded to Relator Tinsley (with a copy to Cavanaugh, Caggiano, Didio, and Grant), and stated: "A challenge for you to champion, bring him along to a point of trusting us and the data on this issue. No voodoo. Just the facts. We may never determine what changed with the Excel needles but they are clearly an issue now. We never had any concerns about any brand of Huber needle anyone used. This has changed and we need to change our thinking and get in front of the issue. There is no way we could have known to warn him or prevent this … sometimes "stuff" just happens and you have to deal with it. We are going to do more than we are logically or actually responsible to do to help him get his patients to settle down. Ryan, you are the closest person to him and we are counting on you to gently help him come to appreciate that we are in this together and we are going to do all we can to help him avoid litigation (his primary concern)."

116.    On April 1, 2009, Vice President, Sales, Didio wrote to Relator Tinsley: "you need to help [Dr. Schwartz] along. I will make sure we do our part internally."

iii.    Additional Bariatric Surgeons Raise Concerns Over Port Defect

117.    Other bariatric surgeons reported similar port failures due to leakage at the same time. On April 1, 2009, Dr. Terry Simpson (Phoenix) wrote to Vincent, Cavanaugh and Tinsley -- with courtesy copies sent to Ahroni, Grant, Gottlieb and Hekier -- stating that "We have a third party who has not concluded that there is an issue with the needles at this point. In fact, with the needles tested, using standard Port-a-cath ports, all needles had no problem." He further suggests to the company that, "If there is an issue with the ports then it would be incumbent to get control of the problem by recall, FDA notification or other mechanism. Without that, having a port issue that appears to be bothering half a dozen surgeons in five states is making it difficult to make that case."

118.    Dr. Simpson also mentioned an upcoming meeting of lap band surgeons in Vegas and that they intended to invite a limited number of Allergan individuals including Grant, Vincent, and Tinsley. He noted, "we will have some strong messages for the company, and would like to present them in a clear and unfiltered manner. I am certain this meeting will be far more valued to Allergan than Costa Rica."

119.    In early April 2009, Dr. Schwartz spoke with NP Ahroni who reported to him that her practice was aware of over 100 failures from leaking ports recently.

120.    On April 6, 2009, Relator Tinsley wrote to Allergan Human Resources, "Some of our customers feel that we are covering up a serious issue with the ports. He [Jim Caggiano] knows this because he heard it right from Dr. Schwartz (sic) mouth. I as the account manager am right in the middle of it and I feel like I'm getting unfair pressure from high up sources to try and get the customer on our side whatever that means."

121.    Confronted with a number of physicians raising concerns about leaking ports, Allergan officials attempted to meet with the physicians individually to deflect concerns over the leaking ports.    In a May 9, 2009 email to Didio and Tinsley, Cavanaugh discussed a potential meeting with Dr. Terry Simpson regarding collection of data on port leaks. Cavanaugh stated, "I think this meeting planning would be best handled in person with Dr. Simpson so that he can share his agenda and idea. If he's in a good mood that day, it will go off great. If something comes up before that meeting, it could be a total disaster. I also think we need clear resolution and direction on the port issue so that we can do our best to address all of the concerns and give them clear answers before they leave.    How close do you think we are to getting data from the testing and review of the returned ports?"

122.    Caggiano and Vincent met with Dr. Simpson in early July 2009 "to take him through the port leaking data."    Soon after that meeting, Dr. Simpson stoped raising concerns about the leaking ports, although his practice continued to experience leaking ports.

123.    Through the next months, Allergan, rather that confronting the defective ports directly, persisted with its strategy of placing blame for the leaking ports on the needles or the surgeon's technique.    On May 13, 2009, Vincent sent an email to Allergan field sales force captioned:    "Needles and Ports."    The email stated, "It has come to our attention that some needles being used for the LAP-BAND® adjustments, while being labeled as non-coring needles, have cored the access port septum. In light of these reports, Allergan recommends use of Allergan Inc's 20 gauge Access Port needles and

Smith's Medical 22 gauge needles in order to avoid coring." Dr. Schwartz received a copy of the same email from Allergan.

124.    On September 25, 2009, Relator Tinsley emailed Didio regarding Dr. Schwartz: "Dr. Schwartz called me and told me Vern called him regarding some new needle we have, I know you probably already know this but there'a a couple surgeons where we would be better off never mentioning the word 'needle' or 'port' ever again. Schwartz and Aktinson to be specific."

125.    On September 30, 2009, a Nevada bariatric surgeon, Dr. Atkinson, wrote to Tinsley: "I don't trust the company based on all the bullshit that went on with the ports and needles, and Allergan is not welcome in my office and certainly not welcome to information that is private and none of their business."

126.    In January 2010, Allergan reiterated again to its surgeon customers that it recommends Allergan's 20 gauge Access Port needles and Smith's Medical 22 gauge needles to avoid coring. Allergan informed physicians of an FDA recall of certain Excel needles.

127.    Starting in April 2010, Relators became aware of an additional number of leaking ports. In April 2010, Dr. Simpson again reported "a run of port issues. . . the latest one is definitely leaking from the base of the port." Relator Tinsley sent Vincent a photo of the leaking port. Vern Vincent directed that returns should be processed for each leaking port for Dr. Simpson.

128.    In May 2010, Pacific Surgical also reported a number of leaking ports and sent back eight ports for Allergan's inspection after explantation. Account Manager Britten requested that Allergan provide Pacific Surgical with a status update on the

returned product.  On May 24, 2010, Account Manager Britten explained to his Regional Manager Colautti that he had met with Dr. Neal who tests each port and "has seen leaks out of the back of the ports."  He noted that "Dr. Neal uses ONLY ALLERGAN needles and does all of his adjustments under fluor.  When he and I looked at the ports we saw them leak.  When he sent them back for analysis product support looked at the ports and didn't find a leak.  This same exact scenario happened over a year ago and Matt and I had to go through tons of hoops to get this handled."  Britten added, "Dr. Neal wonders why he even sends stuff back to product support, he is very steamed and feels they do not examine the ports the same way he does and why even bother to send them back.  I have seen the leaks and we both know that there was a bad run of Port II"s."  He requested replacement ports for five listed patients.

129.    Through May 2010 and June 2010, senior managers at Allergan sought to regain Relator Schwartz' business.  On May 26, 2010, Vice President Caggiano wrote, "I understand why he's pissed re ports.  We are working through that internally at the highest levels.  When I have a definitive answer, I will come there and explain it personally and take my lumps.  But I do feel like I delivered everything else he asked for in terms of inclusion and he always said no. …. At any rate I will continue to make him a priority.  Thanks for continuing to work with him.  We will get him back."

130.    In June 2010, Relator Tinsley reported leaking ports to Allergan for both Dr. Schwartz and Dr. Simpson and requested information about the cause of the leaks. Both were Port IIs and leaked at the base.

131.    In June 2010, Chris Texier, an Allergan Account Manager with Colorado and Utah as his territory, also reported that "I recently have had an unusually high

number of ports explanted because of leaks, worn tubing, or eroded tubes" and that "Vern expects 6 or 7 ports coming back to be inspected" and "4 different surgeons are asking for ports to be donated so patients do not have to pay for reoperation."

>            iv..   Allergan Instructs Sales Force To Lie to Public about Design
>                   Defect

132.    In June 2010, Allergan released a FAQ Product Support and Sales Rep Standard Response sheet for sales representatives to instruct them on answering questions about port leaks among other issues.

133.    Although Allergan had not taken any methodical steps to gather any data on leak rates, the June 2010 sheet states "Infrequent reports of leakage have occurred since APII approval (2001) and that port leakage has come from a variety of causes." Allergan reported that "In both clinical trials and post market surveillance, band leakage occurs in less than 1% of subjects" and that "In some cases, initial performance evaluations conducted by Allergan's Device Analysis Lab on returned ports could not replicate leakage at the access port or access port tubing."

134.    On August 19, 2010, Caggiano informed Didio, Britten and Colautti that they would replace leaking ports "as long as the port is not shown to be leaking due to provider error."

135.    On August 23, 2010, Allergan revised the FAQ document for the APII Port leaks to state: "From all the controlled clinical trials conducted by Allergan on the lap band device, the combined total of all port leaks was less than 2%. Based on our current post market surveillance data, the reported rate of port leaks is less than 1%." Allergan also instructed its sales staff to inform surgeons that the Lap Band systems leak less than 1% of the time in clinical trial and post market surveillance and that in

controlled clinical trial conducted by Allergan that "the combined total of all port leaks was less than 2%."

136.    The August 2010 memo further instructs the sales force that surgeons "should follow Directions for Use . . . to minimize port damage and/or leakage."

137.    Allergan offers to replace the leaking ports free of charge once verified by Allergan.  Allergan does not offer to pay insurers, patients, surgeons or hospitals for costs of explant, new implant or additional adjustments.

      v.      Allergan Offers Remuneration to Physicians Not to Report to FDA and Retaliates Against Dr. Schwartz.

138.    In June 2010, Allergan became aware that there had been a MedWatch report filed with the FDA of a leaking port reported from Dr. Schwartz's hospital, Tuscon Medical Center.

139.    In June 2010, Allergan offered Dr. Schwartz "to put a number on how much he wanted" not to continue to raise concerns about the leaking ports and not to report the leaking ports to the FDA.  At the annual meeting of the American Society of Metabolic and Bariatric Surgeons in Las Vegas, Allergan senior managers Caggiano and Didio met with Schwartz and Tinsley at a suit at the Aria.  Caggiano started the conversation by saying "ok, so our ports leak, we have a big fucking problem, we know it and you know it.  Here's what we are going to do.  We are going to continue to give you free ports and take them as they come." Schwartz rejected the offer.  He  asked whether Allergan were going to contact his 1,000 or so patients who already had the leaking port and tell them that the port leaked.  Caggiano laughed and said "this is the only port we sell world wide and imagine how many thousands of ports are out there."

140.    Caggiano said he would take the ports back one at a time and "deal with them as they come." Caggiano also asked Schwartz to draw up an invoice of what he thought he would need financially to "make things right" and he would submit it to Legal to request payment. He said he would personally deliver whatever money he could get for Schwartz.    Schwarts commented that he thinks he should get an attorney and Caggiano said "that's not necessary."

141.    At the Las Vegas meeting, after Dr. Schwartz left the room, Relator Tinsley asked whether Allergan intended to inform other surgeons who use Port IIs of the leaks.    Caggiano said, "a national announcement? Fuck no.   Are you kidding me?" Caggiano told Tinsley that the reps should tell the surgeons to make sure they enter the port with the needle perpendicularly.  Tinsley asked if they would be replacing the old ports with new ports and Caggiano said "no" and that they would continue to sell the Port IIs.    Caggiano instructed Tinsley to try and find out who was Schwartz's lawyer. Caggiano also mentioned that they had also met with Dr. Neal and that meeting had gone "great."  Caggiano also said that he hoped Schwartz did not get an attorney because he would get "his ass kicked" by Allergan's legal team.

142.    In July 2010, at a National Sales Meeting, Caggiano confronted Relator Tinsley and told him to talk Schwartz out of getting a lawyer and threatened to "kick his ass" if Schwartz ever talked disrespectfully to Caggiano again like he did in Vegas. Caggiano addressed Account Manager Britten and gave him a hearty handshake and said, "We took care of your boy Dr. Neal."  Caggiano said they would be paying Dr. Neal, Legal had approved it, and the amount was $51,000.  Caggiano told Relator Tinsley, "I wish other customers were as cooperative as Dr. Neal."

143.    In addition, Allergan retaliated against Dr. Schwartz by taking him off its promotional website and denying him access to reimbursement support – all because of his objections to the defective ports.

F.    Relators Submit Product Defect Reports to FDA

144.    On March 26, 2009, convinced that Allergan executives had no intention of fixing the leaking port defect, Dr. Schwartz sent an email to the FDA stating "I am a surgeon who performs only the Lap Band procedure. I have experienced an alarming amount of port leaking issues and am concerned about a cover up by Allergan of a larger problem. As a physician, I am obligated to be an advocate of my patients first and need to 'blow the whistle' on this issue that many practices are encountering. I have raised the issue with Allergan and have been 'shot down' so to speak. However, after discussing the issue with other surgeons. It seems to be a HUGE issue."

145.    FDA responded to Dr. Schwartz they had forwarded the message to the Office of Compliance for review.

146.    On May 12, 2009, Relator Tinsley reported Allergan's Lap-band port issues to MedWatch, the FDA Safety Information and Adverse Event Reporting Program. "I work for Allergan as an account manager selling the LAP-BAND SYSTEM. Since May of 2008, I have had a surgeon reporting problems with the access port attached to the LAP-BAND SYSTEM. As the account manager for our company, it is my job to document these problems and have any possible defective ports sent back to our company for analysis. The surgeon (Dr. Monte Schwartz) maintains that the ports are defective and are leaking saline due to some sort of manufacturing defect and bases his assertion on several things. All of these ports require a re-operation to replace the one that isn't

working. During these re-operations he took out the port he felt was leaking and injected Methalyne Blue which is a contrast agent. According to Dr. Schwartz, the dye 'leaked from the base of the port.' He sent the reports back for analysis and after a couple months finally got reports back on two of the ports he sent back to Allergan. Both reports stated that 'a leak test reveal leakage to the port base.' Dr. Schwartz never heard another word from the company and voiced his concerns to me as well as the Vice President of Allergan Medical. Allergan's stance to this point has been to say that the problem lies not in the ports but in the needles the surgeons are using to adjust the ports. Within the last 12 months Dr. Schwartz as well as another surgeon have stated both to me and executives at Allergan that they feel that Allergan is 'covering up' a bigger problem and that asserting that the needles are the culprit of the port issues is just a convenient way to absolve the company of liability....I have documented everything related to these port problems going back to May of 2008 and based on all the emails and conversations with other account managers, I can only concur with the surgeons involved and feel that there may in fact be a much larger problem than the company is alluding to."

147.    FDA acknowledged receipt of Relator Tinsley report by letter on May 20, 2009.

148.    On June 3, 2010, Dr. Schwartz contacted the FDA again to report leaking ports from Allergan. He wrote, "Attached is a recent picture of a leaking Allergan port with the Lap-Band system. I started replacing leaking ports in 2008. I sent them back to Allergan and the first three I returned I received letters from engineers stating the ports were leaking from the base. After that, I did not receive any further communications from Allergan in regards to specific ports I returned. I have replaced about 30 ports over

the past two years.   Replacing a port requires reoperation and has created significant

problems in my practice as a bariatric surgeon.   ... I now know of many surgeons with

similar problems and have heard of one "pay off" to a surgeon in the Northwest.   Most of

the information I receive is from the rep .... [h]e tells me that the company is finally

going to recognize the issue and is releasing a new port shortly to replace the current

ports."   FDA acknowledged receipt of the report.

149.   On June 28, 2010, FDA Office of Compliance wrote to thank him for

providing information.

G.   Allergan Retaliated Against Relator Tinsley for Raising Concerns About
Product Defect Within Allergan and After Reporting Defect to FDA

150.   Starting in March 2009, Allergan managers retaliated against Relator

Tinsley for raising concerns over port defects within Allergan.

151.    On May 12, 2010, Relator Tinsley reported the defect with the port, and

Allergan's campaign to conceal the defect, to FDA.

152.   On August 10, 2010, Allergan terminated Relator Tinsley's employment

for "behavior not indicative of the values and environment of Allergan, insubordination,

and engaging in conduct in violation of the code of conduct."

153.   On August 20, 2010, FDA Division of Product Surveillance spoke with

Relator Tinsley to confirm his "whistleblower complaint" against Allergan.

H.   Allergan Annouces "Field Corrective Action" to Sales Force in September
2010

154.    On September 15, 2010, Allergan sent a notice entitled "Urgent: Field

Correction Action, Lap-Band Adustable Gastric Band System" to all Healthcare

Providers.

155.   In the Notice, Allergan states that it wishes to inform providers of a "potential cause for leakage of the access port" and states that the cause of the leaks to the port is "caused by insertion of the needle into the septum of the port at an oblique angle."

156.   Allergan directs providers that "failure to inject the needle perpendicular to the access port septum, as described in Directions for Use, may lead to port damage which may result in subsequent port leakage.

157.   Through the September 2010 Notice, Allergan continued its campaign of placing blame on surgeons and needles rather than acknowledging that the port leaks are caused by a design defect.

158.   Allergan's direction to insert the needle perpendicular is impractical and inconsistent with training on use of the Lap Band system.  The September 2010 notice continues the concealment of Allergan's knowledge of the product defect and refusal to recall defective ports.

## VI.   ALLEGATIONS

A.   Allergan Knowingly Misbrands the LAP-BAND and Engages in False and Misleading Advertising in Violation of the FDCA that Causes the Submission of False Claims for Payment by the United States

159.   The LAP-BAND is a medical device with the meaning of section 201(h) of the FDCA, 21 U.S.C. § 321(h) and is subject to the laws and regulations governing medical devices.  The LAP-BAND is not subject to an exception and is not substantially the same as a pre-existing device, and therefore is classified as a Class III device.  As a Class III device, the LAP-BAND was subject to premarket approval.  That pre-market approval was conditioned on the performance of a five year follow up study with patients

receiving the device.  In addition, the FDA required annual reports concerning adverse events and device defects.

160.    Defendant has violated the FDCA by distributing and marketing a misbranded medical device and by failing to report to the FDCA that the medical device is defective.

161.    The LAP-BAND is misbranded within the meaning of section 201(h) of the FDCA, 21 U.S.C. 352(j) because it causes potential harm to patients when used as directed.  The necessity of additional surgery to replace the defective LAP-BAND carries with it increased risks of complications and infection, as well as the general risks of any surgery.

162.    Allergan continues to distribute and sell its defective ports, notwithstanding the development of a new port that does not have the same defect and has not informed doctors and patients of the issue.  As a result, patients are potentially implanted with a defective device that substantially increases the need for additional surgery to replace the defective device.

163.    The defect to the port can cause additional harm to the patient health in that a leaking LAP-BAND will not perform its intended function of making the patient feel full.  This may result in the patient not losing weight in the same manner as with a properly functioning device, delaying or preventing a treatment intended to address a wide range of weight-related health problems including diabetes, high blood pressure, and heart conditions.  The failure to lose weight may be misdiagnosed.

164.    Because a misbranded medical device may not be distributed or marketed, and because Medicare and other federal health insurance programs will not pay for a

medical device that is not approved for distribution, Allergan is knowingly causing the submission of False Claims for payment to the United States.

165.   Through its fraudulent course of conduct set forth supra , Allergan has knowingly submitted false claims for reimbursement for Lap Bands where the port does not meet product specifications or expectations.

166.   Federal health insurance programs, including Medicare, Medicaid, and Tricare, will not reimburse claims for medical device implantation where the device is implanted knowing it has a significant risk of leakage requiring either explant and replacement or the device may leak and not work properly.

167.   The claims are false or fraudulent because the medical device is defective and the federal health care programs will not pay for medical devices that the manufacturer knows to be defective.

168.   Allergan is also engaged in false and misleading advertising of the LAP-BAND in violation of the FDCA. 21 U.S.C. §§ 352(q)(1).

169.   Until September 2010, Allergan had not notified patients or doctors of the design defect.  By failing to provide the true information to surgeons, FDA, and the public, Allergan engaged in false and misleading advertising of its product.

170.   In August and September 2010, even though Allergan acknowledged leaking ports, it continued to blame techniques by bariatric surgeons and needles rather than acknowledge the port defect or recall leaking ports publicly.

171.   Allergan's fraudulent scheme to misbrand the Lap Band system and to engage in false advertizing was intended to conceal from surgeons, patients and insurers that Allergan knows the ports to have a significant risk of leaking.

{00024033; 1}

172.   Claims made during that time are false or fraudulent because they arise from a knowing scheme to misbrand the Lap Band system to induce sales by concealing the product defect.   The claims are also false or fraudulent because they arise from a knowing scheme to advertize the Lap Band system falsely to surgeons, insurers and patients and to conceal a known product defect.

B.   Allergan Submitted False and Misleading Reports to the Government that Were Material to Claims for Payment by the Government

173.   Allergan also has failed to report to FDA that is has undertaken to correct its medical device to reduce a risk to health posed by the device as required under the FDCA. 21 U.S.C. § 360i(g); (q)(2).

174.   During the time it has been marketing LAP-BAND, Allergan has received precise and detailed warnings about the defect in the port used in the LAP-BAND. Allergan did not report to the FDA the nature and extent of the problem, despite the fact that it is well understood and Allergan has developed a change to the LAP-BAND designed to correct the defect.

175.   In September 2010, Allergan acknowledged that FDA "has been made aware of this potential access port leakage issue." Allergan did not report to FDA that it had prior knowledge that the port was defective and not caused by improper use of needles or improper technique by bariatric surgeons.

176.   Allergan has failed to submit to FDA a number of Product Defect reports. Allergan's reports to the Government that omit this information are false and misleading.

177.   Allergan's motivation for failing to report this information has been to avoid a recall of its product.  A recall would not only cost Allergan millions of dollars in

direct outlays, but more significantly, would hurt Allergan in the marketplace. Although Allergan initially had the only gastric banding device on the market, there is now a competing product that could capitalize on Allergan's problems if it has to announce a recall of its product. The potential loss of market share could have a much more significant impact on Allergan longterm. As a result, Allergan has sought to downplay and explain away any reports or leaks or their efforts to develop a modification to the device to address the defect.

178. A MedSun Report Describing Adverse Events with the Adjustable Gastric Banding System reports that FDA received only 20 adverse event reports between June 2007 and June 2009. Of those 20 reports, 9 reports were associated with fluid leakage.

179. During that same time frame, Relators are aware of many dozens of leaking ports that should have been reported to FDA by Allergan and, apparently, were not reported. Dr. Schwartz had at least nine leaking ports during that time frame. Dr. Schwartz is aware of a physician in Iowa who had approximately 13 leaking ports at that time. Dr. Schwartz also spoke with a Nurse Practitioner, Jesse Ahroni, at Northwest Weight Loss who told him they had had 123 leaking ports.

180. In addition, during this same time frame, Allergan sought to prevent physicians from reporting the product defect to the FDA by offering to pay them for silence. A specific offer of payment was made to Dr. Schwartz by Allergan's Vice President in the Summer of 2010 at a meeting in Las Vegas, Nevada. On information and belief, Allergan senior managers have made other such offers of money payments to other physicians not to report the design defect to FDA to other bariatric surgeons.

181.    In addition, Allergan terminated Relator Tinsley in response to his raising his concerns about the product defect within Allergan and to stop him from reporting the product defect to FDA or to surgeons.

182.    Failure to report the adverse events and product defect to FDA resulted in the submission of false claims to federal health programs.

183.    Had FDA been made aware of Allergan's knowing concealment of a design defect with the ports, it could have taken steps to institute a recall FDA might have required Allergan to notify federal health programs and other insurers that the device might not perform as intended.  Failure of the device results in additional cost to insurance programs including the cost of explant of the device through additional surgery, the cost of replacement of the device, and the risk that the device would not perform properly defeating the purpose of the weight loss surgery and imposing additional costs on insurers.

C.    Allergan Offered and Paid Kickbacks to Health Care Providers to Induce them to Use the LAP BAND Notwithstanding the Known Defect

184.    Allergan also has engaged in a knowing scheme to cover up the known defect with the ports by offering financial inducements to physicians and physician practices.

185.    In April 2010, Allergan's Mark Didio reported that they have offered Dr. Schwartz the opportunity to participate in a FDA-approved trial, to be on an R&D advisory board, and additional rounds of Port Applier testing as a way to get his business back when he decided to switch to using Ethiconbands to avoid the leaking ports.

186.    Allergan also offered to allow the hospital where Dr. Schwartz refers many of his patients to continue to obtain discounted products even though they were out

of compliance with a contract requiring near exclusive purchases from Allergan. The purported reason for the offer to the hospital was for Allergan to induce Dr. Schwartz' continued use of the Allergan band on his patients even though he was inclined to switch his business to Ethicon band because of the leaking ports on Allergan's LAP-BAND system

187.   Relators allege, based on information provided to them through conversations with witnesses and the affected persons, that Allergan has offered other physicians including Drs. Simpson and Neal additional inducements not to switch their business to Ethicon and to continue to use Allergan Lap Bands.

188.   Relators allege, based on information provided to them through conversations with witnesses and the affected persons, that Allergan has also made financial offers to the following persons to induce their silence about the leaking port defect: Dr. Neal, at Pacific Surgical Center and Dr. Terry Simpson, Phoenix, Arizona. Both Drs. Neal and Simpson had been very vocal about their concerns with leaking ports to Allergan company officials.   After payments were made, and other financial inducements agreed upon, these physicians have withheld comment or reporting of the leaky ports.

189.   On August 11, 2010, Dr. Neal wrote to Caggiano thanking him for his help with the adjustment port leakage from the Las Vegas meeting: "Thank you for the extreme attention to our difficulties."

190.   After Relator Tinsley's termination, he learned that Allergan senior managers had inquired whether Dr. Neal was happy with his deal and whether he had ever gone to the FDA with his concerns about leaking ports.   Relator Tinsley learned that

Dr. Neal was "happy with the arrangement with Allergan." In addition to the substantial cash payment made to Dr. Neal, Relators allege that Allergan made a side deal to pay for all future reoperations going forward attributable to leaking ports for Dr. Neal's patients.

191.   Offering kickbacks to physicians to induce them to use or to recommend medical devices insured under federal programs violates the Anti Kickback Statute. Claims submitted to federal health programs that are the result of an inducement are false claims.

D.   Impact on Private Insurers

192.   The states of California and Illinois have enacted Insurance Fraud Prevention Acts that permit Relators to bring a qui tam action to recover for fraudulent claims submitted to private insurance companies in those states. See Counts [][] and [][] below.

193.   Although this Complaint has focused on the impact of defendant's practices on the federal and state governments, these same practices also defraud private insurance companies in the same manner that the practices defraud the federal and state governments.

194.   The practices alleged herein are systematic, nationwide practices that defraud private insurance companies that reimburse medical procedures in every state where defendant conducts business, including California and Illinois.

Count I
Federal False Claims Act
31 U.S.C. §§ 3729(a)(1)(A)–(B)

195.   Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

196.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

197.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval under Medicaid, Medicare and various other government health care programs, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

198.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved under Medicaid, Medicare and various other government health care programs, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

199.    The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

200.    By reason of the defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

201.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by defendant arising from their unlawful conduct as described herein.

<u>Count II</u>
<u>California False Claims Act</u>
<u>Cal. Gov't Code § 12651(a)(1)-(2)</u>

202.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

203.    This is a claim for treble damages and penalties under the California False Claims Act.

204.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

205.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

206.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

207.    By reason of the defendant's acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

208.    Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count III
California Insurance Frauds Prevention Act
California Insurance Code § 1871.7

209.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

210.    This is a claim for treble damages and penalties under the California

Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7, as amended (referred to in this

Count as "the Act").   The Act provides for civil recoveries against persons who violate

the provisions of the Act or the provisions of California Penal Code sections 549 or 550,

including recovery of up to three times the amount of any fraudulent insurance claims,

and  fines  of  between  $5,000  and  $10,000  for  each  such  claim.    Cal.  Ins.  Code

§ 1871.7(b).

211.    Subsection (e) of Cal. Ins. Code § 1871.7 provides for a qui tam civil

action in order to create incentives for private individuals who are aware of fraud against

insurers to help disclose and prosecute the fraud.  Cal. Ins. Code § 1871.1(e).  The qui

tam provision was patterned after the Federal False Claims Act, 31 U.S.C. §§ 3729–32,

and the California False Claims Act, Cal. Gov't Code §§ 12650 et seq.

212.    Subsection (b) of Cal. Ins. Code § 1871.7 provides for civil recoveries

against persons who violate the provisions of Penal Code sections 549 or 550.  Section

550 of the Penal Code prohibits the following activities, among others:

> (a)    It is unlawful to do any of the following, or to aid,
> abet, solicit, or conspire with any person to do any of the
> following:
>
> \*       \*       \*       \*       \*       \*
>
> (5) Knowingly prepare, make, or subscribe any writing,
> with the intent to present or use it, or to allow it to be
> presented, in support of any false or fraudulent claim.
>
> (6) Knowingly make or cause to be made any false or
> fraudulent claim for payment of a health care benefit.
>
> \*       \*       \*       \*       \*       \*
>
> (b)    It is unlawful to do, or to knowingly assist or
> conspire with any person to do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

Cal. Penal Code § 550.

213.   By virtue of the acts described in this Complaint, defendant knowingly presented or caused to be presented, false or fraudulent claims for health care benefits, in violation of Penal Code § 550(a).

214.   By virtue of the acts described in this Complaint, defendant also concealed and/or failed to disclose information that would have affected the rights of pharmacies to receive reimbursement for prescriptions, in violation of Penal Code § 550(b).

215.   Each claim for reimbursement that was inflated as a result of defendant's illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

216.   Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by defendant, paid and continue to pay the claims that would not be paid but for defendant's unlawful conduct.

217.    The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code § 1871.7. Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count IV
Colorado Medicaid False Claims Act
Colo. Rev. Stat. § 25.5-4-303.5, et seq.

218.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

219.    This is a claim for treble damages and penalties under the Colorado False Claims Act.

220.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

221.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

222.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

223.    By reason of the defendant's acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

224.    Additionally, the Colorado State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count V
Connecticut False Claims Act
Conn. Pub. Law 09-05

225.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

226.    This is a claim for treble damages and penalties under the Connecticut False Claims and Reporting Act.

227.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

228.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

229.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

230.    By reason of the defendant's acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

231.    Additionally, the Connecticut State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

<u>Count VI</u>
<u>Delaware False Claims And Reporting ActU</u>
<u>6 Del C. § 1201(a)(1)-(3)</u>

232.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

233.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

234.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

235.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

236.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

237.    By reason of the defendant's acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

238.    Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

Count VII
District of Columbia Procurement Reform Amendment Act
D.C. Code Ann. § 1-1188.14(a)(1)–(2)

239.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 194 of this Complaint.

240.    This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act.

241.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

242.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

243.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's defective medical device, and/or illegal inducements and business practices.

244.    By reason of the defendant's acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

245.    The District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by defendant.

Count VIII
Florida False Claims Act
Fla. Stat. Ann. § 68.082(2)

246.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

247.    This is a claim for treble damages and penalties under the Florida False Claims Act.

248.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

249.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

250.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

251.    By reason of the defendant's acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

252.    Additionally, the Florida State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count IX
Georgia False Claims Act
Ga. Code Ann. § 49-4-168

253.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

254.    This is a claim for treble damages and penalties under the Georgia False Claims Act.

255.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

256.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

257.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

258.    By reason of the defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

259.    Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

Count X
Hawaii False Claims Act
Haw. Rev. Stat. § 661-21(a)

260.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

261.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

262.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

263.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

264.    The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

265.    By reason of the defendant's acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

266.    Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XI
Illinois Whistleblower Reward And Protection Act
740 Ill. Comp. Stat. § 175/3(a)(1)-(3)

267.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

268.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

269.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

270.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

271.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

272.    By reason of the defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

273.    Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XII
Illinois Insurance Claims Frauds Prevention Act
740 Ill. Comp. Stat. § 92

274.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

275.    This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. § 92.

276.    Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides:

> A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in

> addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

277.   Article 46 of the Illinois Criminal Code, referenced in the above-quoted

section, provides criminal penalties for any person who commits the offense of insurance

fraud, defined in the statute as follows:

> (a)   A person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company . . . .

720 Ill. Comp. Stat. § 5/46-1(a).

278.   Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act

provides for a qui tam civil action in order to create incentives for private individuals to

prosecute violations of the statute.   Subsection 15(a) provides:   "An interested person,

including an insurer, may bring a civil action for a violation of this Act for the person and

for the State of Illinois. The action shall be brought in the name of the State." 740 Ill.

Comp. Stat. § 92/15(a).

279.   By virtue of the conduct described in this Complaint, defendant committed

the following acts, or aided and abetted the commission of the following acts, in violation

of the Illinois Insurance Claims Fraud Prevention Act:   knowingly obtained, attempted to

obtain, and caused to be obtained, by deception, control over the property of an insurance

company or self-insured entity by the making of a false claim and by causing a false

claim to be made on a policy of insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat. § 92/5(b) and 720 Ill. Comp. Stat. § 5/46-1(a).

280.     As a result of such conduct, defendant has received illegal profits to which it was not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in substantial amount to be determined at trial.

281.     The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by defendant in violation of 740 Ill. Comp. Stat. § 92.   Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XIII
Indiana False Claims And Whistleblower Protection Act
IC 5-11-5.5-2(b)(1) and (2)

282.     Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

283.     This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

284.     By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

285.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

286. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

287. By reason of the defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

288. Additionally, the Indiana State Government is entitled to a civil penalty of at least $5,000 for each and every violation alleged herein.

Count XIV
Louisiana Medical Assistance Programs Integrity Law
La. Rev. Stat. § 437 et seq.

289. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

290. This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

291. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

292. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

293. The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

294.    By reason of the defendant's acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

295.    Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XV
Maryland False Health Claims Act
MD. Code Ann., § 2-601, et seq.

296.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

297.    This is a claim for treble damages and penalties under the Maryland False Claims Act.

298.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

299.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

300.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

301.   By reason of the defendant's acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

302.   Additionally, the Maryland State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XVI
Massachusetts False Claims Law
Mass. Gen. Laws ch. 12 § 5B(1)-(3)

303.   Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

304.   This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

305.   By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

306.   By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

307.   The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

308.   By reason of the defendant's acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

309.   Additionally, the Massachusetts State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XVI
Michigan Medicaid False Claims Act
Mich. Comp. Laws. § 400.601

310.   Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

311.   This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

312.   By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

313.   By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

314.   The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

315.   By reason of the defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

316.   Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XVII
Minnesota False Claims Act
Minn. Stat. § 15C.01, et seq.

317.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

318.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

319.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

320.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

321.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

322.    By reason of the defendant's acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

323.    Additionally, the Minnesota State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XVIII
Montana False Claims Act
Mont. Code Ann. § 17-8-401 et seq.

324.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

325.    This is a claim for treble damages and penalties under the Montana False Claims Act.

326.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

327.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

328.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

329.    By reason of the defendant's acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

330.    Additionally, the Montana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XIX
Nevada False Claims Act
Nev. Rev. Stat. Ann. § 357.040(1)(a)-(c)

331.   Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

332.   This is a claim for treble damages and penalties under the Nevada False Claims Act.

333.   By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

334.   By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

335.   The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

336.   By reason of the defendant's acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

337.   Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XX
New Hampshire False Claims Act
N.H. Rev. Stat. Ann. § 167:61-b(I)(a)-(c)

338.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

339.    This is a claim for treble damages and penalties under the New Hampshire False Claims Act.

340.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

341.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

342.    The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

343.    By reason of the defendant's acts, the State of New Hampshire has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

344.    Additionally, the New Hampshire State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XXI
New Jersey False Claims Act
N.J. Stat. § 2A:32C-1

345.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

346.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

347.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

348.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

349.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

350.    By reason of the defendant's acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

351.    Additionally, the New Jersey State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

<u>Count XXII</u>
New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 et seq. and New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 et seq

352.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

353.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act.

354.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

355.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

356.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

357.    By reason of the defendant's acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

358.    Additionally, the New Mexico State Government is entitled to the maximum civil penalty of $10,000 for each and every violation alleged herein.

Count XXIII
New York False Claims Act
N.Y. State Fin. § 187

359.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

360.    This is a claim for treble damages and penalties under the New York False Claims Act.

361.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

362.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

363.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

364.    By reason of the defendant's acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

365.    Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

Count XXIV
North Carolina False Claims Act
N.C. Gen. Stat. § 1-605 et seq.

366.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

367.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

368.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

369.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

370.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

371.    By reason of the defendant's acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

372.    Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

<u>Count XXV</u>
<u>Oklahoma Medicaid False Claims Act</u>
<u>63 Okl. St. § 5053</u>

373.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

374.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

375.   By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

376.   By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

377.   The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

378.   By reason of the defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

379.   Additionally, the Oklahoma State Government is entitled to the maximum civil penalty of $10,000 for each and every violation alleged herein.

Count XXVI
Rhode Island False Claims Act
R.I. Gen. Laws § 9-1.1-1

380.   Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

381.   This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

382.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

383.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

384.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

385.    By reason of the defendant's acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

386.    Additionally, the Rhode Island State Government is entitled to civil penalties for each and every violation alleged herein.

Count XXVII
Tennessee False Claims Act and Medicaid False ClaimsAct
Tenn. Code Ann. §§ 4-18-103(a) and 71-5-182(a)(1)

387.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

388.    This is a claim for treble damages and penalties under the Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

389. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

390. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

391. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

392. By reason of the defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

393. Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XXVIII
Texas Medicaid Fraud Prevention Law
Tex. Hum. Res. Code Ann. § 36.002

394. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

395. This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

396.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

397.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

398.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

399.    By reason of the defendant's acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

400.    Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XXIX
Virginia Fraud Against Taxpayers Act
Va. Code Ann. § 8.01-216.3(a)(1)-(3)

401.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

402.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

403.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

404.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

405.    The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

406.    By reason of the defendant's acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

407.    Additionally, the Virginia State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

Count XXX
Wisconsin False Claims For Medical Assistance Act
Wis. Stat § 20.931 et seq.

408.    Relators repeat and reallege each and every allegation contained in paragraphs 1 through 194 above as though fully set forth herein.

409.    This is a claim for treble damages and penalties under the Wisconsin False Claims For Medical Assistance Act.

410.    By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin Government for payment or approval.

411.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Wisconsin to approve and pay such false and fraudulent claims.

412.    The State of Wisconsin, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for defendant's unlawful conduct.

413.    By reason of the defendant's acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

414.    Additionally, the State of Wisconsin is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

COUNT XXXI
False Claims Act
31 U.S.C. §3730(h)

415.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1- 194.

416.    This is a claim for damages associated with the retaliatory discharge of Relator Tinsley as provided by the False Claims Act, 31 U.S.C. §3730(h),.

417.    By virtue of the acts described above, defendant has retaliated against Relator Tinsley because of lawful acts done in furtherance of an action under 31 U.S.C. §3729 et seq.

Prayer

WHEREFORE, Relators pray for judgment against the defendant as follows:

1.    that defendant cease and desist from violating 31 U.S.C. § 3729 et seq.,

and the counterpart provisions of the state statutes set forth above;

2.      that this Court enter judgment against defendant in an amount equal to three times the amount of damages the United States has sustained because of defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.      that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of California has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code § 12651(a);

4.      that this Court enter judgment against defendant in an amount equal to three times the amount of each claim for compensation submitted by defendant in violation of Cal. Ins. Code § 1871.7(b), plus a civil penalty of $10,000 for each violation of Cal. Ins. Code § 1871.7(b);

5.      that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Colorado has sustained because of defendant's actions,   plus a civil penalty of $10,000 for each violation of Colorado Medicaid False Claims Act, Col. Rev. Stat. 25.5-4-303.5, *et seq.*

6.      that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Connecticut has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Conn. Pub. Law 09-05;

7.      that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Delaware has sustained because of

defendant's actions, plus a civil penalty of $11,000 for each violation of 6 Del. C. § 1201(a);

8.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the District of Columbia has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of D.C. Code Ann. § 1-1188.14(a)(1)–(2);

9.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Florida has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Fla. Stat. Ann. § 68.082(2);

10.    that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Georgia has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Georgia Code Ann. § 49-4-168;

11.    that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Hawaii has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. § 661-21(a);

12.    that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Illinois has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. § 175/3(a);

13.    that this Court enter judgment against defendant in an amount equal to

three times the amount of each claim for compensation submitted by defendant in violation of 740 Ill. Comp. Stat. § 92, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. § 92;

14.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Indiana has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Ind. Code § 5-11-5.5 *et seq.*;

15.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Louisiana has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. § 437 *et seq.*;

16.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Maryland has sustained because of defendant's actions,  plus a civil penalty of $10,000 for each violation of MD. Code Ann., § 2-601, *et seq.*;

17.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 § 5B *et seq.*;

18.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Michigan has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of  Mich. Comp. Laws § 400.601 *et seq.*;

19.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Minnesota has sustained because of defendant's actions,  plus a civil penalty of $10,000 for each violation of Minn. Stat. § 15C.01, *et seq.*;

20.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Montana has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of  Mont. Code Ann. § 17-8-401 *et seq.*;

21.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Nevada has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of  Nev. Rev. Stat. Ann. § 357.040(1);

22.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New Hampshire has sustained because of defendant's actions, plus civil penalties for each violation of N.H. Rev. Stat. Ann. § 167:61-b(I);

23.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New Jersey has sustained because of defendant's actions, plus civil penalties for each violation of N.J. Stat. § 2A:32C-1 *et seq.*;

24.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New Mexico has sustained because of defendant's actions, plus civil penalties for each violation of N.M. Stat. Ann. § 27-14-4 *et*

*seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.*;

25.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New York has sustained because of defendant's actions, plus civil penalties for each violation of N.Y. State Fin. § 187 *et seq.*;

26.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of North Carolina has sustained because of defendant's actions,  plus a civil penalty of $11,000 for each violation of N.C. Gen. Stat. § 1-605 *et seq*;

27.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of defendant's actions, plus civil penalties for each violation of 63 Okla. St. § 5053 *et seq.*;

28.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of defendant's actions, plus civil penalties for each violation of R.I. Gen. Laws § 9-1.1-1 *et seq.*;

29.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Tennessee has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. §§ 4-18-103(a) and 71-5-182(a)(1);

30.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Texas has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of  Tex. Hum. Res. Code Ann. § 36.002;

31.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Virginia has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Va. Code Ann. § 8.01-216.3(a);

32.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of the Wis. Stat. § 20.931 *et seq.*;

33.     that Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above and of any Doe States that authorize similar qui tam actions while defendants misconduct continues and during the pendency of this action;

34.     that Relators be awarded all costs of this action, including attorneys' fees and expenses; and

35.     that Relators recover such other relief as the Court deems just and proper.

### Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.


Dated:  October  10 , 2010          By: _Peter W. Chatfield_

PHILLIPS & COHEN LLP

Peter W. Chatfield
peter@phillipsandcohen.com
Colette G. Matzzie
cmatzzie@phillipsandcohen.com
Phillips & Cohen LLP

{00024033; 1}

2000 Massachusetts Ave., NW
Washington, DC. 20036
Telephone: (202) 833-4567
Fax: (202) 833-1815

Claire Sylvia
Phillips & Cohen LLP
131 Steuart Street, Suite 501
San Francisco, CA  94105
Telephone:  (415) 836-9000
Fax:  (415) 836-9001

Attorneys for *Qui Tam* Plaintiffs